United States District Court
Middle District of Florida
Jacksonville Division

**TIMOTHY NATHAN GREEN,**

*Plaintiff,*

v.                                                          **NO. 3:22-cv-875-PDB**

**ACTING COMMISSIONER OF SOCIAL
SECURITY,**

*Defendant.*

---

# Order

Timothy Green brings this action under 42 U.S.C. § 405(g) and § 1383(c) for review of a final decision of the Acting Commissioner of Social Security denying his application for supplemental security income. Doc. 1. The final decision is a decision by an administrative law judge (ALJ) signed on November 26, 2021. Tr. 15–28. Green argues the ALJ erred by failing to properly evaluate opinions of Arnold Graham Smith, M.D., and Mark Emas, M.D.; by failing to properly analyze Green's subjective symptoms; and by failing to address the effect of post-traumatic cerebral concussion syndrome. Doc. 17 at 9–25. The Acting Commissioner argues there is no error. Doc. 18 at 6–19. Summaries of the law and the administrative record are in the ALJ's decision, Tr. 15–28, and the parties' briefs, Docs. 17, 18, and not repeated here except to the extent necessary to understand the decision.

## I.    Overview

Green was born in 1982. Tr. 266. He applied for supplemental security income in August 2020, alleging disability from degenerative disc disease, herniations in his spine, back spasms, hypertension, and leg numbness. Tr. 234–39, 257.

The ALJ proceeded through the five-step process.[1] Tr. 15–28.

At step one, the ALJ found Green has not engaged in substantial gainful activity since August 25, 2020, the amended alleged onset date. Tr. 17.

At step two, the ALJ found Green has severe impairments of cervical disc disease, thoracic disc disease, lumbar disc disease, obesity, hypertension, major depression, and post-traumatic stress disorder. Tr. 17.

At step three, the ALJ found Green has no impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 18.

At this step, the ALJ rejected Green's argument that his musculoskeletal impairments satisfy Listing 1.15, explaining:

---

[1]To decide whether a person is disabled, the SSA uses a five-step sequential process. 20 C.F.R. § 416.920(a)(4). At step one, the ALJ asks whether the claimant is engaged in "substantial gainful activity." *Id*. At step two, the ALJ asks whether the claimant has a severe impairment or combination of impairments. *Id*. At step three, the ALJ asks whether the claimant has an impairment or combination of impairments meeting or medically equaling the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. At step four, the ALJ asks whether the claimant can perform any of his "past relevant work" considering his residual functional capacity (RFC). *Id*. And at step five, the ALJ asks whether the claimant can adjust to other work considering the claimant's RFC, age, education, and work experience. *Id*. If the ALJ finds disability or no disability at a step, the ALJ will "not go on to the next step." *Id*.

[T]here are numerous diagnostic tests in the medical evidence of record delineating multilevel degenerative disc disease throughout the spine with multiple disc herniations. However, [Green] does not have a musculoskeletal impairment that meets the severity of Listing 1.15. [He] does not have:

1. A documented medical need for a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device involving the use of both hands; or

2. An inability to use *one* upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements, *and* a documented medical need for a one-handed, hand-held assistive device that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand; or

3. An inability to use *both* upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements.

[Green] does not have a documented medical need for an assistive device. On examination, [his] gait has been normal based. In a Physical Residual Functional Capacity Questionnaire dated September 16, 2021, Dr. Smith did *not* indicate that [he] requires a cane or other assistive device while engaging in occasional standing/walking.

Tr. 18–19 (internal citations omitted).

Also at this step, the ALJ discussed a nerve-conduction study and a questionnaire completed by a doctor:

A Needle EMG Nerve Conduction Study on September 9, 2020 showed (1) evidence consistent with *mild* chronic left CS-C6 radiculopathy; (2) evidence consistent with *mild* bilateral carpal tunnel syndrome; and (3) no evidence of a post traumatic upper extremity plexopathy.

In a Physical Residual Functional Capacity Questionnaire dated September 16, 2021, Dr. Smith indicated that [Green] is able to use his hands to grasp, turn, and twist objects 100% of the time, and he is able to perform fine manipulation 100% of the time during an 8-hour workday. The medical record does not document an inability to use the

3

upper extremities to initiate, sustain, and complete work-related activities involving fine and gross movements.

Tr. 19 (internal citations omitted).

Also at this step, the ALJ found Green's mental impairments did not satisfy Listings 12.04 and 12.15. Tr. 19. For the criterion "understanding, remembering, or applying information," the ALJ found Green has a moderate limitation. Tr. 19. The ALJ explained:

> This area of mental functioning refers to the abilities to learn, recall, and use information to perform work activities. The claimant has endorsed difficulties with short-term memory. Exhibit 9F. However, the record indicates that the claimant has no problem with short-term and long-term memory function. Exhibit 14F. The claimant has the ability to follow through with medical advice and prescribed treatment. He has insight into his impairments and prognosis. He has had no difficulty following one and two-step instructions at medical appointments. He has had no difficulty describing his medical and work history. Therefore, the claimant is found to have no more than moderate restrictions in this area.

Tr. 19. For the criterion "interacting with others," the ALJ found Green has a mild limitation. Tr. 19. The ALJ explained:

> This area of mental functioning refers to the abilities to relate to and work with supervisors, co-workers, and the public. At the hearing, the claimant endorsed irritability. In a consultative examination, the claimant's mood appeared dysphoric, and he had a somber affect. However, the report also notes:
>
> > Mr. Green answered questions fairly easy with little prompting. Mr. Green did not appear to be overly guarded or evasive. There were no behavioral indications of anxiety, depression, or thought disorder at the time of the interview. Exhibit 14F/5.
>
> September 2020 progress notes from EMAS Spine & Brain Specialists indicate that the claimant's affect and mood have been normal on examination. Exhibit 9F/18. Therefore, the claimant is found to have no more than mild restrictions in this area.

4

Tr. 19–20. For the criterion "concentrating, persisting or maintaining pace," the ALJ found Green has a moderate limitation. Tr. 20. The ALJ explained:

> This area of mental functioning refers to the abilities to focus attention on work activities and stay on task at a sustained rate. The record indicates that the claimant has endorsed difficulties with concentration. Exhibit 9F. However, there were no significant issues in concentration and persistence in the consultative examination. Exhibit 14F/6. The claimant could count backwards from twenty to one with no errors. He could count by threes, from one to thirty-seven with no major problems. Exhibit 14F/5.

Tr. 20. For the criterion "adapting or managing oneself," the ALJ found Green has a moderate limitation. Tr. 20. The ALJ explained:

> This area of mental functioning refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting. The claimant was diagnosed with Major Depression following a consultative examination. However, the claimant has presented to appointments appropriately dressed and groomed. He has interacted effectively and appropriately with medical personnel and with the consultative evaluator.

Tr. 20.

Also at this step, the ALJ found no evidence Green has a "serious and persistent" mental impairment. Tr. 20.

The ALJ found Green has the residual functional capacity (RFC) to perform "sedentary work"[2] with additional limitations:

---

[2]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a).

"'Occasionally' means occurring from very little up to one-third of the time. Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of

> [Green] has the ability to lift and carry 10 pounds occasionally and 5 pounds frequently; sit for up to 6 hours, stand for up to 2 hours, and walk for up to 2 hours; push and pull as much as he can lift and carry; occasional use of foot controls; occasional use of hand controls; no more than occasional overhead reaching; and frequent handling, fingering, and feeling. [He] should not work in any environments with temperature extremes. [He] is limited to simple tasks and simple work-related decisions with no more than frequent interaction with supervisors, coworkers, and the general public. Time off task could be accommodated by normal workday breaks. [He] needs a sit or stand option that allows for a change of position at least every 30 minutes which is a brief positional change lasting no more than 3 minutes at a time where [he] remains at the workstation during the positional change.

Tr. 21.

> The ALJ discussed Green's allegations and testimony:

> In a Disability Report, [Green] alleged an inability to work due to degenerative disc disease (DDD), herniations in the spine, back spasms, hypertension, high blood pressure, and numbness in the legs.

> At the hearing, [Green] testified that he is 39 years of age. He stands at 6 feet and weighs 220 pounds. He lives with his adult son. He drives once per week. The main reason that he is unable to work is low back pain, sciatica radiating into the extremities, and back spasms wherein he is in bed for three to five days. [He] also noted that he has difficulty urinating. He has neck pain and his hand clenches. Pain medication allows him to function but does not alleviate the pain. He wets himself throughout the day. He does not have insurance. He experiences fatigue and anxiety. Sitting for long periods exacerbates the pain. He is able to sit for up to an hour at one time with medication. He is able to stand for 30 minutes at one time with medication. He is able to walk a block with medication. He is able to lift and carry 10 pounds. Side effects of medication include confusion, memory loss, irritability, fatigue, severe anxiety, and loss of concentration. He is able to watch television and follow a storyline. He is able to prepare meals. He visits with his grandmother on occasion. He naps during the day. He experiences

---

standing or walking should generally total no more than 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." Social Security Ruling 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983).

numbness in the hands, and he drops items once or twice per day. He has numbness and tingling in the lower extremities as well.

Tr. 21–22 (internal citations omitted).

The ALJ found Green's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Tr. 22.

The ALJ discussed Green's treatment for back pain:

[Green] has a history of back pain with herniated nucleus pulposus at L3-4 and L5-S1 and multilevel herniated disc protrusions in the thoracic spine. An EMG/NCV test in the bilateral lower extremities in 2014 showed chronic right L5-S1 and S1 left radiculopathy. [Green's] medical history has been detailed in the Representative Brief.

On July 23, 2020, [Green] presented to North Florida Spine and Injury Center with complaints of moderate-severe lower back pain, numbness in the upper extremities occurring 50-80% of the time, and moderate-severe neck pain. [Green] was involved in a motor vehicle accident five days prior. On examination, [he] had tenderness to palpation, muscle tension, muscle spasm, and multiple trigger points in the cervical, thoracic, lumbar spine, and sacroiliac joint. He had reduced range of motion of the spine. In terms of manual muscle testing, the cervical muscles, lumbar muscles, and muscles of the upper and lower extremities were normal. Lasegue's straight leg raise was positive bilaterally. Reflexes in the upper and lower extremities were 2+ bilaterally. Conservative treatment was recommended. In his report, Adam Zeccardi, DC, noted:

Mr. Green is advised that he may return to his previous occupational activities only with the strong recommendation to avoid any and all activities that may aggravate his current condition. Mr. Green is instructed to perform only "light duty" occupational tasks to include no prolonged sitting or standing for more than 30 minutes without changing positions; and no repetitive activities which aggravate [his] conditions such as lifting, bending, or any strenuous physical activity for even short periods of time until reevaluation reveals sufficient resolution of

7

his condition. He is instructed that these are somewhat generalized instructions and if his supervisors necessitate more specific restriction guidelines his employer must submit a copy of his job description.

An MRI of the lumbar spine on July 30, 2020 showed multilevel degenerative disc disease with (1) disc herniation compressing the thecal sac at L1-L2; (2) disc herniation compressing the thecal sac at L2-L3; (3) disc herniation compressing the thecal sac causing moderate bilateral neural foraminal narrowing at L3 L4; (4) disc bulge compressing the thecal sac and causing some right and moderate left neural foraminal narrowing at L4-L5; and (5) disc herniation with increased signal indicating edema/annual tear compressing the thecal sac at L5-S1.

An EMG Nerve Conduction Study on September 16, 2020 showed (1) limited evidence consistent with a mild left S1 lumbosacral radiculopathy with both acute and chronic features; (2) no evidence of a post-traumatic lower extremity plexopathy; and (3) no evidence of an entrapment neuropathy or mononeuropathy in the lower extremities.

Tr. 22–23 (internal citations omitted).

The ALJ described an April 1, 2021, consultative examination with Peter Knox, M.Ed., Psy.D.:

[Green] denied inpatient and outpatient mental health treatment. He denied a history of suicidal ideation. [He] noted, "I think there is something wrong, like the dreams of the abuse. I think about it all the time." On examination, [his] mood appeared dysphoric, and he had a somber affect. There was no indication of tangential or circumstantial thinking. He could relate information in a rational, coherent, and sequential fashion. He could count backwards from twenty to one with no errors. He could easily say his ABCs. He could count by threes, from one to thirty-seven, with no major problems. He could recall four out of four words at five minutes. He could remember having chicken sandwiches for dinner the previous evening. He could remember a recent news story about COVID. He could remember three of the four words at fifteen minutes. He denied hallucinations and delusions. He did not have a problem ambulating. He was cleanly dressed, and he answered questions fairly easily with little prompting. He did not appear to be overly guarded or evasive. There were no behavioral indications of anxiety, depression, or thought disorder at the time of the interview. Following the examination, [he] was diagnosed with Major

Depression, Posttraumatic Stress Disorder, and Alcohol Abuse in recent remission. He was assigned a global assessment of functioning (GAF) of 50, indicating serious symptoms.

Tr. 23 (internal citations omitted).

The ALJ quoted a letter from Dr. Smith:

This man came to see me as a new patient on 5/28/2021. He was complaining of backache and leg pain as a result of a series of automobile accidents which began in 2012. He had another motor vehicle accident in 2017 and most recently had an accident last year in 2020. To avoid having an operation he has spent a lot of time seeing pain management doctors who have given him pills for the pain. He has now reached a point at which he wants to have something done to stop the pain so he can get on with his life.

His x-rays show that the L4-5 disk is very narrow and the MRI studies suggest that at least L5-S1 will have to be included in his treatment and it is uncertain as yet whether L3-4 is similarly damaged. He is a hard-working man who has continued to work despite multiple injuries. The latest accident in 2020 has brought him to the point at which he can no longer work regularly.

This man will require a spinal fusion operation which takes up to 6 months to become solid. In order to support his lumbar spine he will need a brace and in order to make sure that it heals on time and as quickly as possible, he will require a bone growth stimulator which cost[s] over $2000.

Tr. 23–24 (internal citation omitted).

The ALJ found Green's alleged impairments are inconsistent with the medical evidence:

Overall, when the record is considered in its entirety, though [Green] has multiple medical impairments, the totality of the evidence does not support the presence of an impairment, or combination thereof, that imposes listing level restrictions or that substantially interferes with [his] ability to perform a reduced range of sedentary work activity. The medical evidence of record suggest[s] that [he] can sustain a greater capacity than he described at the hearing or in his reports to Disability Determinations. Given this evidence, the undersigned concludes [he]

9

has not satisfied his burden to show that he cannot work. The undersigned finds that neither the severity of his impairments nor the extent of his alleged limitations is supported by the objective medical and other evidence of record. Furthermore, the limitations that do exist are adequately accommodated for in [his RFC] as established above.

[Green] has some significant spine issues but nothing to preclude sedentary work with a sit/stand option. During the consultative examination, [he] stated that he could lift and carry 10 pounds, and he did not appear to have any problems with sitting/standing during the exam. In an impairment questionnaire, Dr. Smith indicated that [he] could sit for 30 minutes at one time and stand for 30 minutes at one time. The medical record does not confirm the occurrence of any significant and persistent adverse side effects from medications. [Green] has not experienced significant complications secondary to elevated blood pressure.

Tr. 24 (internal citations omitted).

The ALJ rejected a "Disability Determination Explanation" as unpersuasive because the determination was made before the alleged onset date. Tr. 25. The ALJ considered records of a chiropractor:

In July 2020, Adam Zeccardi, DC, advised [Green] to avoid activities that may aggravate his condition. [Green] was instructed to perform only "light duty" occupational tasks to include no prolonged sitting or standing for more than 30 minutes without changing positions. He was also cautioned on performing repetitive activities such as lifting, bending, or any strenuous physical activity for even short periods of time until reevaluation revealed sufficient resolution of his condition. This opinion is partially persuasive; however, the opinion was formed with[in] a few days of the 07/18/2020 motor vehicle accident. Accordingly, the opinion does not address the effectiveness of subsequent treatment.

Tr. 25. The ALJ considered records and opinions of Dr. Emas:

Following the July 2020 accident, [Green] presented to EMAS Spine and Brain Specialist for posttraumatic cervical pain, thoracic pain, lumbosacral pain, and headache. Dr. Emas noted that [he] should continue with light duty activity. Dr. Emas further stated:

Bending, stooping, pushing and pulling, reaching and pulling, sitting and standing for long periods of time including working on a computer or traveling in a vehicle for extended periods of time can exacerbate his symptoms. He also has difficulty sleeping which can result in a poor night's sleep and subsequent daytime fatigue. [Green] is a mason contractor and has been able to perform his work, although it has been more difficult with his spine pain and cognitive inefficiencies. [He] has only been able to do limited work due to the accident and due to his spine pain and cognitive inefficiencies ([he] is only evaluating contracts at this time and not doing any of the labor). He also [is] subcontracting a lot of the work. Most of the work is given to his son or other subcontractors.

Dr. Emas's medical opinion is partially persuasive, as he based his opinion upon his treating relationship with [Green], and he is able to provide a longitudinal picture of [Green's] medical impairments. However, in an abundance of caution, the undersigned has limited [Green] to sedentary work with a sit/stand option.

Tr. 25 (internal citations omitted).

The ALJ considered opinions of state agency medical consultants:

In April 2021, a State agency medical consultant reviewed the record and found [Green] capable of a reduced range of light work. The medical consultant noted that [Green's] symptoms do not correlate well with the nerve study findings. A State agency psychological consultant reviewed the records and found non severe mental impairments with no more than mild limitation in the B criteria of the Listings. These opinions are partially persuasive as the doctors are disability specialists who reviewed the evidence of record and considered all of the objective facts at the time they rendered their opinion. However, considering evidence received at the hearing level, the undersigned has included additional limitations to the [RFC] assessment as described above.

Tr. 25–26.

The ALJ considered the records and opinions of Dr. Smith:

In September 2021, Dr. A. Graham Smith, M.D., completed a Physical [RFC] Questionnaire on behalf of [Green]. Therein, Dr. Smith noted that [Green] has chronic low back pain, and his symptoms are severe enough to interfere with the attention and concentration needed to perform even

simple tasks 25% or more of an 8-hour day. Dr. Smith further indicated that [Green] is incapable of even a low stress job due to severe chronic pain. He can only walk one city block without rest or severe pain. He is only able to sit for less than 2 hours and stand/walk less than 2 hours in an 8-hour workday. He is unable to reach. He is likely to be absent from work as a result of the impairments or treatment more than four days per month. Dr. Smith stated that [Green] has severe pain and needs surgery. He indicated that it is unknown whether the symptoms and limitations applied since 2015.

Dr. Smith's opinion is partially persuasive, as the doctor had an opportunity to examine [Green] before forming his opinion; however, there is a concern that the doctor relied too heavily on [Green's] subjective report of his symptoms and limitations, uncritically accepting as true most, if not all, of what [Green] reported. Notably, Dr. Smith examined [Green] only once, and the overall medical evidence of record does not contain the type of significant clinical and laboratory abnormalities that one would expect if [Green] were in fact disabled and unable to complete an 8-hour workday. On exam in January 2020, [Green] had normal strength and normal reflexes. He displayed no atrophy. A sensory deficit was present with reduced sensation in the lateral thighs. Straight leg raise was positive. However, coordination and gait were normal. In July 2020, manual muscle testing in the cervical spine, lumbar spine, upper extremities, and lower extremities was normal. In October, November, and December 2020, [Green] had 5/5 motor strength throughout. Gait was normal based. In January 2021 and April 2021, [Green] had 5/5 motor strength throughout, and gait was normal based. As noted above, [Green] has some significant spine issues but nothing to preclude sedentary work with a sit/stand option.

Tr. 25–26 (internal citations omitted).

The ALJ considered a Global Assessment of Functioning (GAF) rating:

The GAF score … is unpersuasive, as a GAF score represents a clinician's judgment about the severity of an individual's symptoms or level of mental functioning at a particular moment in time, much like a snapshot. It does not provide a reliable longitudinal picture of the claimant's mental functioning. What is more, the mental status examination does not support a finding of serious symptoms (i.e., suicidal ideation, severe obsessional rituals, frequent shoplifting, no friends, and an inability to keep a job). In the consultative examination, the claimant denied a history of inpatient or outpatient mental health treatment. He denied a history of suicidal ideation. There was no

12

> indication of tangential or circumstantial thinking. The claimant's recent and remote memory were intact. His concentration was within normal limits. He denied hallucinations and delusions. There were no behavioral indications of anxiety depression or a thought disorder at the time of the interview.

Tr. 26 (internal citations omitted).

At step four, the ALJ found Green has no past relevant work. Tr. 27.

At step five, the ALJ found Green is "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." Tr. 28.

Thus, the ALJ found Green is not disabled. Tr. 28.

The Appeals Council denied review. Tr. 1–6. This case followed. Doc. 1.

## II.   Standard of Review

A court's review of the Commissioner's decision is limited to whether substantial evidence supports the factual findings and whether the correct legal standards were applied. 42 U.S.C. § 1383(c) (incorporating § 405(g)); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoted authority omitted). The "threshold for such evidentiary sufficiency is not high." *Id.*

If substantial evidence supports the Commissioner's decision, a court must affirm, even if other evidence preponderates against the factual findings. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158–59 (11th Cir. 2004). The court may not decide facts anew, reweigh evidence, make credibility

13

determinations, or substitute its judgment for the Commissioner's judgment. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## III.   Law and Analysis

The RFC finding was restrictive, limiting Green to sedentary work with numerous other limitations. *See* Tr. 21. Substantial evidence supports the RFC finding. This evidence includes examination findings that Green had normal strength and reflexes, displayed no atrophy, had normal coordination and gait, had mostly normal manual muscle testing in the cervical and lumbar spine and upper and lower extremities, and had full motor strength at multiple examinations; Green's own report that he could lift and carry ten pounds; a consultative examination during which he appeared to sit and stand without issue; opinion evidence that he could sit or stand for thirty minutes at a time; an absence of evidence of ongoing or severe side effects from medication; no significant complications from hypertension; and generally conservative and routine treatment. Tr. 49–50, 400–01, 427, 525, 530, 577, 581, 603. Green's arguments to the contrary, Doc. 17 at 9–25, are addressed in turn.

## A.   *The ALJ properly evaluated Dr. Smith's and Dr. Emas's opinions.*

Green argues the ALJ erred by failing to properly evaluate Dr. Smith's and Dr. Emas's opinions. Doc. 17 at 9–18.

An ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 416.920c(a). An ALJ will consider: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) "other factors," including evidence that a medical source is familiar with the other evidence in

the claim or understands the disability program's policies and evidentiary requirements. *Id.* at § 416.920c(c)(1)–(5).

The most important factors are supportability and consistency, and the ALJ must explain how he considered them. *Id.* at § 416.920c(a), (b). For supportability, the "more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* § 416.920c(c)(1). For consistency, the "more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 416.920c(c)(2).

An ALJ must consider all relevant record evidence. *Id.* §§ 416.920(a)(3), 416.920b. But "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision … is not a broad rejection which is not enough to enable [the court] to conclude that the ALJ considered [the claimant's] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (cleaned up).

According to Green, the ALJ failed to adequately consider the supportability and consistency of Dr. Smith's and Dr. Emas's opinions. Doc. 17 at 9–18.

Dr. Smith opined Green cannot perform a low-stress job because of his severe chronic pain, can walk only one city block without rest or severe pain, can sit for less than two hours and stand or walk for less than two hours in an eight-hour workday, cannot reach, and is likely to be absent from work more

than four days a month. Tr. 625–30. The ALJ found this opinion "partially persuasive." Tr. 26. Although the ALJ did not use the words "supportability" and "consistency," he nevertheless evaluated those factors. *See* Tr. 26. He explicitly identified conflicting evidence, including examination findings that Green had normal strength and reflexes, displayed no atrophy, had normal coordination and gait, had normal manual muscle testing in the cervical and lumbar spine and upper and lower extremities, and had full motor strength at multiple examinations. Tr. 26 (citing Tr. 400–01, 427, 525, 530, 577, 581, 603). The ALJ also observed Dr. Smith examined Green only once and appeared to rely "uncritically" on Green's subjective allegations. Tr. 26 (citing Tr. 626).

Green argues the records the ALJ cites also contain abnormal findings and findings consistent with the limitations in Dr. Smith's opinion. Doc. 17 at 15–17. Findings consistent with the limitations in Dr. Smith's opinion do not negate the inconsistencies the ALJ identifies. To the extent Green asks the Court to reweigh the evidence, the Court may not do so. To the extent Green argues the ALJ should have discussed every piece of evidence, the ALJ was not required to do so; the decision "is not a broad rejection" insufficient for the Court to conclude that the ALJ considered his medical condition as a whole. *See Dyer*, 395 F.3d at 1211 (quoted).

Dr. Emas opined Green "should continue with light duty activity" and stated:

> Bending, stooping, pushing and pulling, reaching and pulling, sitting and standing for long periods of time including working on a computer or traveling in a vehicle for extended periods of time can exacerbate [Green's] symptoms. He also has difficulty sleeping which can result in a poor night's sleep and subsequent daytime fatigue. [Green] is a mason contractor and has been able to perform his work, although it has been more difficult with his spine pain and cognitive inefficiencies. [He] has only been able to do limited work due to the accident and due to his spine

> pain and cognitive inefficiencies ([he] is only evaluating contracts at this time and not doing any of the labor[)]. He also [is] subcontracting a lot of the work. Most of the work is given to his son or other subcontractors.

Tr. 535–36. The ALJ found the opinion "partially persuasive," but "in an abundance of caution" limited Green to sedentary rather than light work. Tr. 25.

Green is correct that the ALJ failed to explain the supportability and consistency factors, but Green fails to show reversible error. He identifies no greater limitation in Dr. Emas's opinion than in the RFC.

Green argues, "The ALJ found that [he] could perform sedentary work which required at least six hours of sitting in an eight hour day and two hours of standing provided he could stand up for three minutes every 30 minutes. Even if [he] could stand up for three minutes every 30 minutes, he would be sitting for 54 minutes out of every hour (or 90% of an eight hour workday). This conflicted with Dr. Emas'[s] opinion that [he] could not sit *and* stand (not 'or') for long periods." Doc. 17 at 12–13. As the Acting Commissioner persuasively counters, "This argument is belied by the fact that the ALJ found [Green] required a sit/stand option that would allow him to shift positions every 30 minutes. This directly incorporates Dr. Emas's opinion because it means [Green] is never required to sit or stand for longer than 30 minutes at a time." Doc. 18 at 14 (internal citation omitted).

Green argues, "Dr. Emas also said that reaching (*in any direction*) and pulling and pushing and pulling would exacerbate [his] symptoms. The ALJ limited *overhead* reaching to occasional and imposed no restrictions for *reaching in other directions*. The ALJ concluded that [he] could perform pushing and pulling within limits of sedentary work - contrary to Dr. Emas." Doc. 17 at 13. As the Acting Commissioner persuasively counters, "Dr. Emas

did not elaborate on his limitations nor specify how frequently and in which directions [Green] could or could not reach," and the ALJ included an overhead-reaching limitation. Doc. 18 at 15.

Green argues, "The ALJ did not include any restrictions as far as sitting at a workstation or working at a computer for extended periods." Doc. 17 at 13. But the ALJ included a sit-stand option as a limitation. Tr. 21.

About both doctors' opinions, Green complains that "the ALJ essentially described the content of medical opinions, stated he was finding them 'partially persuasive,' and formulated an RFC assessment that is opposite from two neurologists .... The ALJ did not address the commonality between Dr. Emas['s] and Dr. … Smith's opinions[.]" Doc. 17 at 17–18. As described above, the ALJ sufficiently explained his partial rejection of Dr. Smith's opinion, and Green fails to show the RFC is inconsistent with Dr. Emas's opinion. To the extent Green argues the ALJ was required to explicitly compare the doctors' opinions, he cites no authority and fails to show error.

Green complains the ALJ failed to properly analyze Dr. Emas's opinion about his post-traumatic cerebral concussion syndrome. Doc. 17 at 13–14. The Court addresses the argument below.

Remand to reevaluate Dr. Smith's and Dr. Emas's opinions is unwarranted.

### B.   *The ALJ properly evaluated Green's subjective statements.*

Green argues the ALJ erred by failing to properly analyze his subjective symptoms. Tr. 18–23.

To determine disability, the Social Security Administration (SSA) considers all symptoms, including pain, and the extent to which the symptoms "can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 416.929(a). Statements about symptoms alone cannot establish disability. *Id.* § 416.929(a), (b). Objective medical evidence from an acceptable medical source must show a medical impairment that "could reasonably be expected to produce" the symptoms and, when considered with the other evidence, would lead to a finding of disability. *Id.* § 416.929(a), (b).

The finding that an impairment could reasonably be expected to produce the symptoms does not involve a finding on the intensity, persistence, or functionally limiting effects of the symptoms. *Id.* § 416.929(b). For that finding, the SSA considers all available evidence, including medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. *Id.* § 416.929(a), (c). The SSA then determines the extent to which the "alleged functional limitations and restrictions due to the … symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how" the symptoms affect the ability to work. *Id.* § 416.929(a).

To determine the extent to which symptoms affect a claimant's capacity to perform basic work activities, the SSA considers statements about the intensity, persistence, and limiting effects of the symptoms; the statements in relation to the objective medical and other evidence; any inconsistencies in the evidence; and any conflicts between the statements and other evidence, including history, signs, laboratory findings, and statements by others. *Id.* § 416.929(c)(4).

An ALJ must clearly articulate explicit and adequate reasons for rejecting a claimant's testimony about symptoms. *See Foote v. Chater*, 67 F.3d 1553, 1561–62 (11th Cir. 1995) (specific to pain). A court will not disturb a clearly articulated symptoms finding supported by substantial evidence. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014).

Boilerplate language is not necessarily objectionable—whether the ALJ relied on substantial evidence is what matters. *See McGill v. Comm'r of Soc. Sec.*, 682 F. App'x 738, 741 (11th Cir. 2017) (finding substantial evidence supported the ALJ's finding despite the appellant's argument that the ALJ used boilerplate language).

Here, Green testified that he will stay in bed for three to five days because of pain and back spasms, he has difficulty urinating and incontinence, he has neck pain, his hand clenches, pain medication allows him to function but does not alleviate the pain, he experiences fatigue and anxiety, sitting too long exacerbates the pain, he can sit for an hour with medication, he can stand for thirty minutes with medication, he can lift about ten pounds, he naps during the day, he experiences hand numbness and drops items once or twice a day, he has numbness and tingling in his legs, and medication side effects include confusion, memory loss, irritability, fatigue, severe anxiety, and poor concentration. Tr. 45–50, 57–58.

Insofar as the RFC finding was restrictive, limiting Green to sedentary work with numerous other limitations, *see* Tr. 21, the ALJ did not reject Green's testimony entirely. Instead, the ALJ explained he found Green's testimony about the severity of his symptoms inconsistent with the evidence described in the decision, including mild to moderate examination findings, normal manual muscle testing, multiple records showing full strength and a

normal gait, Green's own report that he could lift and carry ten pounds, a consultative examination during which he appeared to have no problem sitting or standing, Dr. Smith's indication that he could sit or stand for thirty minutes at a time, the absence of record evidence of significant and persistent adverse side effects from medications, the lack of significant complications from high blood pressure, conservative treatment, the absence of mental-health treatment, and other treatment records. Tr. 22–26.

Green essentially argues the ALJ insufficiently explained the finding that Green's statements about his symptoms were inconsistent with the evidence and the finding that the evidence fails to support the alleged severity and extent of his limitations. Doc. 17 at 18.

Specifically, Green complains the ALJ includes boilerplate language "regarding the symptoms not being consistent with the record." Doc. 17 at 20. To the contrary, the ALJ did more than simply use boilerplate language; he reviewed the evidence and discussed why he did not find Green as limited as alleged. *See* Tr. 22–27.

Green complains, "[T]he ALJ selectively describes some of the medical evidence … but never actually engages in a detailed discussion of … Green's pain or other symptoms. Most of his discussion essentially amounts to conclusory statements that … Green is limited to sedentary work with a sit/stand option. … [H]e does not discuss the vast majority of the medical evidence supporting his pain and other symptoms." Doc. 17 at 20. As discussed above, the ALJ is not required to discuss every piece of evidence. In any case, the ALJ discussed Green's statements and discussed enough evidence to make clear the basis for finding inconsistencies.

Green argues his "subjective symptoms and pain are supported by the objective medical evidence" and points to specific pieces of evidence and his testimony. Doc. 17 at 20–22. He adds, "Although the ALJ summarized the testimony, nowhere did he specifically explain *why* he was not crediting … Green's testimony or symptoms or identify material inconsistencies other than 'normal motor strength' and normal 'gait.' The ALJ's reliance on these two examination findings was improper given the many abnormal findings not acknowledged by the ALJ at these same medical office visits[.]" Doc. 17 at 22. The ALJ, however, discussed more evidence than medical findings of "normal motor strength" and "normal gait," as described above. Green essentially asks the Court to reweigh the evidence, but the Court may not do so. Even if other evidence preponderates against the ALJ's decision, the Court must affirm the decision because it is supported by substantial evidence. *See Crawford*, 363 F.3d at 1158–59.

Green concludes, "[T]he ALJ failed to articulate explicit and adequate reasons for discounting the severity of … Green's pain and other symptoms. The ALJ has not pointed to any meaningful inconsistencies and instead summarily assessed his limitations without adequate discussion of the evidence." Doc. 17 at 22–23. This argument is unpersuasive; although the ALJ did not specifically identify the evidence that conflicts with each particular statement, the ALJ addressed the statements and the evidence in general, and from the discussion, the inconsistencies are clear.

Remand to reevaluate Green's subjective statements is unwarranted.

## C. *The ALJ did not err by failing to consider Green's concussion.*

"Disability" means "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

An ALJ is "under no obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." *Duffy v. Comm'r of Soc. Sec.*, 736 F. App'x 834, 838 (11th Cir. 2018) (internal quotation marks and quoted authority omitted).

Approximately six weeks after an automobile accident in which Green did not strike his head, lose consciousness, or experience dizziness or confusion after impact, Dr. Emas diagnosed him with "[p]ossible post-traumatic cerebral concussive syndrome[.]" Tr. 544. In the treatment notes, Dr. Emas stated, "Post-concussive treatment has been explained in detail including but not limited to getting plenty of rest; avoiding bright lights, loud sounds, increased physical activity and activities requiring increased cerebral stimulation. … [Green] to notify our office for increased symptoms." Tr. 545. At a follow-up visit about four weeks later, Dr. Emas diagnosed him with "[p]ost-traumatic concussive symptoms[.]" Tr. 535. Later treatment records by Dr. Emas do not include concussion-related advice. *See* Tr. 577, 581, 603, 616, 621.

Approximately seven months after the "possible" concussion diagnosis, Green underwent a mental-status examination performed by Dr. Knox. Tr. 592–97. Dr. Knox diagnosed him with major depression, post-traumatic stress disorder, and alcohol abuse. Tr. 597. Dr. Knox's notes include no mention of a concussion or related symptoms. Tr. 592–97.

Green did not identify a concussion or concussive symptoms as an impairment on his disability application. *See* Tr. 257. At the hearing, Green did not mention a concussion when the ALJ asked him to describe the

conditions impairing his ability to work. Tr. 44–49. His representative asked, "Did you have any change in personality, or anything like that, post the concussion?" Tr. 56. He answered, "I haven't noticed it, but my son has been telling me I've been acting strange. And he – I haven't told him about any of the pain medication I've been taking, so he's in the dark about that because I didn't want him to know. But he's – I don't know if it's from that or the pain medication. I'm not sure." Tr. 56.

Green complains, "[T]he ALJ never analyzed (or even mentioned) [his] post traumatic cerebral concussion syndrome." Doc. 17 at 24. Green, however, never alleged disability from a concussion, leaving the ALJ no obligation to consider the concussion as a basis for disability. *See Duffy*, 736 F. App'x at 838. In any event, Green points to no evidence showing the impairment was more than a temporary one.

Green speculates the conditions of the mental-status evaluation "likely" did not include "being exposed to bright lights, [noise,] and excessive cerebral stimulation. Dr. Knox did not administer any detailed testing that would have required ongoing focus and the entire appointment likely was fairly short as compared to a full eight hour workday." Doc. 17 at 25. He fails to show reversible error. Even if concussive symptoms would not have been obvious during the mental-status evaluation but could nevertheless affect Green's ability to work, Green never alleged he was disabled by a concussion.

Green argues the ALJ "failed to analyze Dr. Emas'[s] opinion regarding functional limitations relative to the condition." Doc. 17 at 23. But the treatment notes are not an opinion about Green's limitations; they are simply a description of medical advice Dr. Emas gave Green for recovering from a "possible" concussion shortly after the concussion may have occurred. *See* Tr.

24

545. In any case, as discussed, the ALJ was not required to consider a concussion.

Remand to evaluate the effect of post-traumatic cerebral concussion syndrome is unwarranted.

## IV.   Conclusion

The Court **affirms** the Acting Commissioner's decision and **directs** the clerk to enter judgment for the Acting Commissioner and against Timothy Nathan Green and close the file.

**Ordered** in Jacksonville, Florida, on September 28, 2023.

_____

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

25